IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Irish J. and Alan J., individually and as<br>Parents and Natural Guardians of A.J., a minor | : <br> : <br> : | |
| *Plaintiffs,* | : <br> : | **CIVIL NO. 02-6000** |
| Vs. | : <br> : | |
| EAST STROUDSBURG BOARD OF EDUCATION | : <br> : <br> : | |
| *Defendant.* | : <br> : | |

## I.    PARTIES

1. Petitioners are Irish J. and Alan J. ("Parents" or "Petitioners") appearing in their individual capacity, and on behalf of their minor child, A.J. (together, the "Petitioners").

2. Defendant is the East Stroudsburg Board of Education (the "District," "local educational agency," or "LEA"), with its offices located at 50 Vine Street, East Stroudsburg, Pennsylvania, 18301

3. A.J. is a student enrolled within the District, which is located in the District, which is located within the Borough of East Stroudsburg.

4. At all times relevant to the due process matter described herein, Parents and A.J. resided within the boundaries of the District.

## II. JURISDICTION AND VENUE

5. This Court has federal question jurisdiction under 28 U.S.C §1331, and a specific grant of jurisdiction under § 615(a) of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415(i)(2).

6. Venue properly lies in the District Court for the Middle District of Pennsylvania under 28 U.S.C. §1391, as the parties reside within, and the causes of action arose within this District.

7. The claims comprising this Complaint have been fully exhausted at the state administrative level through a final judgment in a state due process proceeding before the Pennsylvania Office of Dispute Resolution ("ODR"), Alan J. v. East Stroudsburg Area School District, ODR Docket No. 21306/18-19 AS. The Independent Hearing Officer presiding in that case, Charles W. Jelley (the "IHO"), issued a Decision and Order, dated August 9, 2019 (hereinafter, the "Decision"), which is attached to this Complaint as Annex "A."

### III. STATEMENT OF FACTS

8. A.J. is currently a first-grade student, in attendance at the East Stroudsburg Elementary School, which is located within the bounds of the District.

9. A.J. is diagnosed with autism spectrum disorder and developmental delay.

10. The District presently provides A.J. with special education and related services through an Individualized Education Program ("IEP"). Though A.J. has an IEP, he presently attends school in the general education classroom.

11. Prior to attending the District A.J. attended early intervention and preschool in the Colonial Intermediate Unit 20, (the "I.U.") where he received early intervention services. Here, the I.U. provided support through an individualized family service program and an individualized education program ("IEP").

12. The records from Colonial I.U. 20 indicate that A.J. often copies the problem behaviors of his peers.

13. A.J. started kindergarten in the District in September 2018.

14. Starting at the beginning of kindergarten (2018-2019 school year), A.J. engaged in disruptive behaviors while at school.

15. The District conducted a functional behavior assessment ("FBA"), or "line of inquiry," on September 24, 2018.

16. The FBA was not conducted by a board certified behavioral analyst ("BCBA").

17. During September 2018, the District employed what it termed substitute aides to work with A.J. These substitute aides also worked with the other children in the classroom, and were not specifically assigned to A.J. These aides were not permanent aides, nor were they registered behavior technicians. In fact, they had no training, whatsoever, and were not guided by a BCBA.

18. On or about October 11, 2018, while at an IEP meeting, the District proposed to place A.J. at Chipperfield Elementary School. Chipperfield is run by the I.U. In other words, the District sought to place A.J. out-of-district. Here, the District sought to place A.J. in a more-restrictive autism support classroom.

19. During September and the first few weeks of October 2018, the District failed to implement any meaningful interventions. Instead of providing adequate support and behavior interventions, the District sought to quickly remove A.J. from the general education classroom.

20. On October 14, 2018, Parents returned the Notice of Recommended Educational Placement ("NOREP") to the District, indicating that they did not agree with the proposed placement, and would be filing for due process. The NOREP noted that part of the reason for the recommended change in placement was A.J.'s behaviors.

21. Parents filed a *pro se* petition for due process on October 14, 2018, to challenge, among other things, the proposed placement. Chief among Parents' concerns was that the placement was overly restrictive, and was not calculated to provide A.J. with a free appropriate public education ("FAPE") in the least restrictive environment ("LRE").

22. On November 9, 2018, this Firm filed an amended petition for due process.

23. Parents additionally retained Dr. Sarah Woldoff, a neuropsychologist and BCBA, to evaluate A.J. Dr. Waldoff evaluated A.J. on November 12 and 27, 2019. Dr. Woldoff observed A.J. at school on November 27, 2018.

24. For the evaluation, Dr. Woldoff tested A.J.'s cognitive ability and found that A.J. is in the low-average range. She found that A.J. has a "pretty well-developed nonverbal IQ." Related, Dr. Woldoff indicated that A.J. "did quite well" on his school readiness assessment, that his numerical operations and alphabet writing were in the normal limits.[1] Because she found that A.J. has many intact skills, she confirmed that A.J. should be

---

[1] Dr. Woldoff indicated that A.J. has more language than she suspected and that he can talk "when he wants to."

placed in an inclusion-based or general education classroom with a registered behavior technician and support from a BCBA.

25. Dr. Woldoff, based on her expertise, affirmed that the least-restrictive environment would be most appropriate for A.J. She further affirmed that A.J. should be in the general education classroom for all subjects. Dr. Woldoff concluded that the general education classroom would benefit A.J. socially, emotionally, and academically.

26. Around November and December, A.J.'s problem behaviors disappeared, according to the District. Even though the substitute aides lacked training, their presence helped A.J. to engage in appropriate behavior.

27. By December 2018, the placement at Chipperfield Elementary School was no longer available. The District, then, decided it wanted to place A.J. at the Resica Elementary School, which is run by Colonial I.U. 20 (the "I.U."). Here, the District proposed to place A.J. in the autism support classroom.

28. The parties began the due process hearing on January 3 and 4, 2019.

29. On February 8, 2019, the IHO ordered an interim placement at the I.U., for the District to complete the VB MAPP assessment.

30. Notably, the IHO additionally ordered an IEP meeting following the assessment.

31. A.J. returned to his neighborhood school, East Stroudsburg Elementary School, on or around April 15, 2019.

32. When he returned to his neighborhood school, the District reported that A.J.'s behaviors worsened for the first two weeks. The District noted that the substitute aides were absent

during this time. During his school transition, A.J. went without an aide. The absence of the aide, moreover, contributed to the behavior regression.

33. Within approximately two weeks after the substitute aide returned, the District indicated that A.J's problem behaviors decreased.

34. Here, it should be noted, for much of the school year, A.J.'s behavior improved. Specifically, between November 2018 and April 2019, A.J. did not engage in problem behaviors. Again, though the District did not provide trained aides, the presence of the aides helped A.J. behave during class.

35. The Parties attended the ordered IEP meeting on May 2, 2019. At this IEP meeting, the District again proposed placing A.J. in the I.U. autism support classroom.

36. On May 14, 2019, Parents, through undersigned counsel, sent an email to counsel for the District, providing their written objection to the IEP.

37. Here, Parents renewed their objection that placement was overly restrictive and was not calculated to provide A.J. with a FAPE.

38. Then, on May 24 and June 8, 2019, the parties participated in the last two hearing sessions.

39. On July 15, 2019,  the parties submitted written closing briefs.

40. On August 9, 2019, the IHO issued the final decision and order.

41. The IHO found (i) in favor of the District and against the Parents on all IDEA denial of FAPE and LRE claims; (ii) the IHO ordered that the District implement the May 2019 IEP, which placed A.J. in the more-restrictive autism classroom at Resica Elementary School; (iii) that Parents are not entitled to compensatory education; and (iv) that Parents

are not entitled to the costs of their private neuropsychological evaluation by Dr. Sarah Woldoff.

42. The IHO, however, found favorably for Parents:  (i) that the District shall provide a one-on-one aide for all of A.J.'s classes and settings throughout the day; (ii) that the District shall re-evaluate A.J. at the conclusion of the 2019-2020 school year; and (iii) that the District shall provide training to the one-on-one aides, without limitation, to collect data on A.J. to implement the IEP and the positive behavior support plan.

43. This petition followed the IHO's decision.

## IV CAUSES OF ACTION

### COUNT 1.
### Denial of FAPE under the IDEA.

44. Petitioners incorporate by reference all of the allegations set forth hereinabove, as if fully set forth herein.

45. Parents and A.J. are parties aggrieved by the IHO's final Decision and Order and timely bring this action pursuant to § 615(i)(2) of the IDEA, 20 U.S.C. §1415(i)(2). More specifically, the IHO committed a reversible error when he found that the District had not denied A.J. a FAPE when the District failed to properly program for A.J.'s behavioral concerns, which disrupted his education and that of others.

    a. The IDEA regulations mandate, "In the case of a child whose behavior impedes the child's learning or that of others, the IEP team must consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 CFR §300.324(2).

    b. The District did not tailor the IEPs to program for A.J.'s behaviors.

    c. The records and testimony indicated that in September 2018 and at other times during the year when the District failed to provide an aide, A.J.'s behaviors included, elopement, climbing on furniture, refusal to listen, spitting, and other related disruptions.

    d. The District failed to develop an efficacious behavioral plan, through the IEP, to address these concerns.

    e. The IEP did not call for trained aides and/or registered behavior technicians to address A.J.'s behavior.

    f. As a direct result, A.J. struggled with his behavior at school during the first few weeks at school. A.J.'s behaviors interfered with his academic progress and his ability to function in the classroom.

    g. The IHO erred, as a matter of law, when he found that the District had not denied A.J. a FAPE when the District did not adequately program for A.J.'s behavior.

46. The IHO committed a reversible error when he found that the District did not deny A.J. a FAPE when the District failed to employ properly trained aides, through the IEP, to work with A.J.

    a. The IDEA regulations mandate, "In the case of a child whose behavior impedes the child's learning or that of others, the IEP team must consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior," 34 CFR §300.324(2).

    b. The IDEA requires LEAs to employ paraprofessionals that are capable of meeting the needs of the children with whom they work. The IDEA maintains the policy to

"allow paraprofessionals and assistants who are appropriately trained and supervised, in accordance with State law, regulation, or written policy, in meeting the requirements of this part to be used to assist in the provision of special education and related services under this part to children with disabilities." §612 (14)(B)(iii).

c.  While the District did employ classroom aides to work with A.J., the aides were not trained on how to address all of A.J.'s behavioral needs.

d.  In fact, the District only provided untrained, substitute aides to work with A.J.

e.  Per Dr. Woldoff's evaluation, the District should have provided trained, registered behavior technicians to work with A.J. The District should have provided these registered behavior technicians through the IEP. The District, however, only provided untrained, substitute aides.

f.  In the alternative, absent a registered behavior technician, the District should have at least provided an aide that was trained by a BCBA.

g.  These aides were ill-equipped to carry out the IEP and to provide A.J. with a FAPE. As such, these aides frustrated the purpose of the IEP.

h.  Because the District employed untrained substitute aides, the District denied A.J. the benefit of consistent expectations.

i.  The District additionally failed to provide the same, consistent aide each day. Instead, A.J. was assisted by different aides on a daily basis.

j.  As a result of failing to provide consistent and trained aides, A.J. did not make meaningful gains.

  k. The IHO erred when he did not find that the District denied A.J. a FAPE when the District failed to provide trained aides through the IEP.

47. The IHO committed a reversible error when he found that the District did not deny A.J. a FAPE when the District failed to consistently provide the classroom aides through the IEP, which allowed A.J.'s behavior to regress.

  a. The District provided A.J. with untrained substitute aides. Though these aides lacked training, they did manage, in part, to control A.J.'s behavior.

  b. By working with an aide, A.J. was able to participate in the general education class. Through the District's and Parents' testimony, A.J.'s behavior improved when the aides were present. In fact, the behaviors that the District witnessed in September disappeared after the aides started working with him.

  c. As prior noted, A.J. was placed on an interim basis in the Resica Elementary School for approximately sixty days. In or around April 2019, when A.J. returned to East Stroudsburg Elementary School, the District failed to provide the substitute aides for several weeks.

  d. During the time the District failed to provide the substitute aides, A.J.'s behavior regressed. In other words, he started to present with the same educationally-disruptive behavior from earlier in the year.

  e. As a direct and proximate result of the District failing to implement the aides, A.J. regressed. Here, A.J. regressed behaviorally, which interfered with his ability to meaningfully participate in his education. The District's break in services, therefore, caused A.J. to lose the behavioral gains he had made.

    f.  The IHO should have awarded compensatory education for the break in services.

    g.  The IHO erred when he did not consider A.J.'s behavioral regression when the District failed to provide the substitute aides for several weeks.

48. The IHO committed a reversible error when he found that the District did not deny A.J. a FAPE when the District failed to conduct a complete FBA and to base the positive behavior support plan on the same.

    a.  The IDEA requires school districts to develop a positive behavior support plan based on FBA data when the student's behavior interferes with the student's learning or that of others. 20 U.S.C. §1414(d)(3)(B)(i).

    b.  The District conducted what it calls a line of inquiry, which is not a formal FBA.

    c.  The District's line of inquiry was inadequate to program for A.J.'s needs and did not provide sufficient data from which the District could program for his behaviors.

    d.  The line of inquiry was not conducted by a BCBA.

    e.  Because the line of inquiry was incomplete, the District lacked the much-needed data to program for A.J.'s behavioral needs.

    f.  The District did not have the full picture of A.J.'s behavioral concerns, and, therefore, lacked essential information to develop a positive behavior support plan.

    g.  The positive behavior support plan was not calculated to provide A.J. with a FAPE. Furthermore, the positive behavior support plan was not calculated to

allow A.J. to thrive in the LRE. The lack of solid FBA data contributed to the inefficacious positive behavior support plan.

h. The District denied A.J. a FAPE when it failed to conduct a complete FBA.

i. The District further denied A.J. a FAPE when the District did not develop a positive behavior support plan based on complete FBA data.

j. The IHO erred when he did not consider the fact that the District failed to base A.J.'s programming on a complete FBA, conducted by a BCBA. Furthermore, the IHO erred when he did not consider the fact that the positive behavior support plan was not based on solid FBA data.

49. The IHO committed a reversible error when he found that the District did not deny A.J. a FAPE when the District failed to develop IEPs that were calculated to provide A.J. a FAPE.

a. School districts provide a FAPE by designing and administering a program of individualized instruction that is set forth in an IEP. *See* 20 U.S.C. §1414(d). The IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential. Moreover, a district is required to create an IEP that is "appropriately ambitious in light of the circumstances." [2]

b. The District's IEP was not calculated to provide A.J. with a FAPE.

c. The IEPs lacked meaningful goals and objectives, together with inadequate specially designed instruction.

---

[2] *Endrew F. v. Douglas County Sch. Dist., RE-1*, 137 S. Ct. 988 (2017).

    d.  The IEP ignored, without limitation, A.J.'s social, emotional, and behavioral needs.

    e.  The IEP lacked sufficient positive behavioral supports.

    f.  The IEP did not adequately consider A.J.'s social needs; nor, did it provide adequate social-skills training as a related service.

    g.  The IHO did not consider the fact that the IEP was not calculated to provide A.J. with a FAPE.

    h.  The IHO erred when he did not find that the District denied A.J. a FAPE when it failed to develop appropriate IEPs for A.J.

50. The IHO committed a reversible error when he found that the District did not deny A.J. a FAPE when the District offered to place A.J. in the most restrictive placement.

    a.  The IDEA requires that school districts educate students with disabilities in the "least restrictive environment" (the "LRE"). The IDEA further asserts, "to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or the removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that the education in regular classes with the same use of supplementary aides and services cannot be achieved satisfactorily." 20 U.S.C.§1412(a)(5)(A).

    b.  Starting in September 2018, the District has intended to remove A.J. from the general education classroom. Initially, in September 2018, the District proposed removing A.J. from the general education classroom. In fact, the District proposed

to remove A.J. from his school entirely. Here, the District offered to place A.J. at I.U. 20, in the autism support classroom.

c. Parents, however, filed for due process on October 4, 2018, thereby invoking their right to A.J.'s stay-put placement, per 20 U.S.C. § 1415 (e)(3).

d. The District complied with the stay-put placement for the remainder of the school year.

e. In May 2019, the District proposed a second IEP, which sought to remove A.J. from East Stroudsburg Elementary School and out of the general education classroom. Here, the District sought to place A.J. in the autism support classroom at Resica Elementary School.

f. The autism support classroom at Resica Elementary School is run by I.U. 20, and not by the District.

g. Parents' expert, Dr. Woldoff, found that such an overly-restrictive placement would be certain to cause A.J. to regress. Moreover, the placement would not allow A.J. to make meaningful gains based on his present levels.

h. When the IHO issued his final decision, he ordered that the District place A.J. in the more-restrictive placement at Resica.

i. The IHO's order contravened the IDEA's least restrictive environment mandate.

j. The IHO did not consider that based on A.J.'s present levels, that the placement was overly restrictive.

k. The IHO additionally did not consider that A.J.'s behavior improved over the course of the year when he ordered the placement. Again, the main thrust of the District's desire place A.J. out of district was his behavior.

l. The IHO also did not consider the fact that the District did not first try interventions before attempting to remove A.J. from the classroom. Here, the District did not employ registered behavior technicians nor other similar supports to see what it could do to keep A.J. in the LRE.

m. Instead, the District rushed to remove A.J. from the classroom after only a few weeks into the school year.

n. The District's proposed placement is overly restrictive and would only cause A.J. to regress. The placement is not calculated to provide A.J. with a FAPE.

o. The IHO erred when he ordered that the District place A.J. in the autism support classroom at Resika.

**PRAYER FOR RELIEF**

**WHEREFORE,** Petitioners respectfully request that this Court:

a. Docket the administrative record from the state due process proceeding and receive it into evidence.

15

b.  Reverse the IHO's findings in his Decision and Order dated August 9, 2019, where he found: (i) in favor of the District and against the Parents on all IDEA denial of FAPE and LRE claims; (ii) where the IHO ordered that the District implement the May 2019 IEP, which placed A.J. in the more-restrictive, autism support classroom at Resica Elementary School; (iii) that Parents are not entitled to compensatory education; and (iv) that Parents are not entitled to the costs of their private neuropsychological evaluation by Dr. Sarah Woldoff.

c.  Affirm the IHO's order where he found (i) that the District shall provide a one-on-one aide for all of A.J.'s classes and settings throughout the day; (ii) that the District shall re-evaluate A.J. at the conclusion of the 2019-2020 school year; and (iii) that the District shall provide training to the one-on-one aides, without limitation, to collect data on A.J. to implement the IEP and the positive behavior support plan.

d.  Award compensatory education for all of the time that A.J. was denied a FAPE, up to and including the pendency of this instant matter, and until A.J. is in the appropriate program and placement moving forward.

e.  Enter a judgement finding that the District denied A.J. a FAPE.

f.  Reimburse Parents for evaluations and other expert fees and costs.

g.  Grant such other relief as appropriate.

h.  Award Petitioners' reasonable attorneys' fees and costs; and

i.  Enter Judgement in favor of Parent and against all Defendants.

Respectfully submitted,

**MONTGOMERY LAW, LLC**
1420 Locust Street, Suite 420
Philadelphia, Pennsylvania 19102
*Attorneys for Plaintiffs*


By: /S/Joseph W. MontgomeryEsq.
PA Bar ID: 209527

## CERTIFICATION

    I hereby certify that the within pleading was filed with the U.S. District Court, Middle District of Pennsylvania, and copies were sent to all counsel known of record on the below date.


Dated: November 7, 2019

        Montgomery Law, LLC
        Attorneys for Defendants
        K.S. on behalf of L.S.

        **/s/ Joseph Montgomery**
        Joseph Montgomery, Esq.
        PA Bar ID: 209527