IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IRISH J. and ALAN J., individually and as Parents and Natural Guardians of A.J., a minor, | : Civil No. 3:19-CV-01926 : : : |
| Plaintiffs, | : : |
| v. | : : |
| EAST STROUDSBURG AREA SCHOOL DISTRICT, | : : : |
| Defendant. | : Judge Jennifer P. Wilson |

# MEMORANDUM

This is a case arising under the Individuals with Disabilities Education Act ("IDEA") seeking to determine whether a student with disabilities received a free appropriate public education in the least restrictive environment as required by the Act. Before the court is Plaintiff A.J.'s motion for judgment on the administrative record. (Doc. 14.) The court holds that the hearing officer did not err in his factual findings or legal conclusions in deciding that A.J. was not denied a free appropriate public education by Defendant East Stroudsburg School District ("the District"). For the reasons that follow, A.J.'s motion for judgment on the administrative record is denied.

# FACTUAL BACKGROUND[1]

At the time of the due process hearing, A.J. was a first-grade student in the District. (Doc. 17-3, p. 2.)[2] Prior to attending kindergarten in the District, A.J. attended an early intervention program and preschool at the local intermediate unit where he received specially-designed instruction and related services. (*Id.* at 2–3.) Before starting kindergarten, the District evaluated A.J. through multiple evaluations to gauge motor, speech, functional, and academic skills. (*Id*. at 3.) The report noted that A.J. had communication, language, attention, behavioral, executive functioning, planning, and organizational needs. (*Id.* at 4.) Thus, the District concluded that A.J. was IDEA eligible and that A.J. was a person with a speech and language impairment. (*Id.*)

On June 14, 2018, Irish J. and Alan J. ("the parents") and the District met to formulate A.J.'s kindergarten individualized education program ("IEP"). (*Id.*) This IEP included six measurable annual goals supported by sixteen different forms of specially-designed instruction ("SDI"), related occupational therapy services, and itinerant speech and language supports for 20% or less of the school day. (*Id.*) Based on this IEP, the District proposed A.J. be placed in a full-time regular education kindergarten with forty sessions of thirty-minute speech and

---

[1] The court finds that there is no reason to overturn the hearing officer's findings of fact. Therefore, facts in this section will be cited from the findings of fact section of the hearing officer's order. (Doc. 17-3.)
[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

language support in a small group, all to be provided in A.J.'s neighborhood school. (*Id*.) On June 17, 2018, A.J. was diagnosed with autism spectrum disorder. (*Id*.) In response to this IEP, the parents sent a seven-page letter requesting a series of changes, including placing A.J. in a regular education first-grade class, providing a trained one-on-one aide who could implement behavioral strategies, and more descriptive communication goals. (*Id*. at 5.) However, this letter did not reject the IEP, so A.J. received all the services in the IEP upon starting school in August 2018. (*Id*.)

On October 11, 2018, after several months in kindergarten, the parents and the District met again to re-formulate A.J.'s IEP. (*Id*.) The October IEP noted A.J.'s academic progress so far in kindergarten, but also his behavioral problems, such as being noncompliant, failing to follow teacher directives, and engaging in elopement behavior. (*Id*.) This IEP also noted that behavioral interventions were not making a significant difference in A.J.'s behavior. (*Id*.) As a result of these observations and the District's awareness of A.J.'s diagnosis of autism, the IEP included a clear statement of A.J.'s unique needs and ten measurable goals with a multitude of techniques meant to help A.J. achieve these goals. (*Id*. at 6.) This IEP suggested A.J. participate with non-disabled peers for science, social studies, recess, lunch, and assemblies while participating in the autistic support program for core academic instruction. (*Id*.) This suggested placement would have resulted in

more than 20% but less than 80% of A.J.'s day being spent in the autistic support class with support provided by the special education personnel and speech and language support. (*Id.*) It was also determined that A.J. needed a one-on-one aide. (*Id.* at 7.)

However, the parents rejected this offer and requested a due process hearing as afforded to them under the IDEA. (*Id.*) The parents also requested a one-on-one behavioral trained aide, smaller class setting for part of the day, a positive behavior support plan, and a functional behavioral assessment performed by a board-certified behavioral analyst. (*Id.*) Additionally, the parents hired an expert, Dr. Woldoff, who performed a number of assessments on A.J. and observed him in his kindergarten classroom. (*Id.* at 8.) A.J's results on these assessments were consistent with an autism spectrum diagnosis. (*Id.* at 9.) Based on the assessments and her observations, Dr. Woldoff concluded that A.J. would benefit from discrete-trial-training targeting academics, visual perception/match to sample tasks, listener responding, beginning math and reading skills, time telling, and social and emotional skill development. (*Id.*) Dr. Woldoff opined that the best place for A.J. to receive this litany of programming would be in a regular education classroom with support from a trained aide. (*Id.*)

On February 9, 2019, after hearing the testimony of various witnesses, the hearing officer issued an interim order providing for a diagnostic evaluation of A.J.

in order for the District to assess A.J.'s present levels of academic achievement and functional performance.  (*Id*. at 10.)  This required A.J. to be placed in an autistic support verbal behavioral classroom in a neighboring elementary school.  (*Id.*)  The diagnostic assessment showed that A.J. had higher barriers to his learning in the regular education classroom setting than in the autistic support classroom setting.  (*Id*. at 11.)  The assessment also showed that A.J. could benefit from time in a regular education setting, but that he does need a more supportive setting with individualized instruction as well.  (*Id*. at 12.)

On May 2, 2019, after the results of the diagnostic testing were available, the parents and the District met again to reformulate A.J.'s IEP.  (*Id*. at 13.)  This IEP noted that A.J. was on task more often and attempted to elope less often in the autistic support classroom than in the regular education classroom.  (*Id.*)  The IEP also noted A.J.'s academic improvement.  (*Id*.)  Based on the diagnostic assessment and continued observation of A.J., the IEP suggested that A.J. needed additional special education instruction beyond the regular education curriculum.  (*Id*. at 14.)  The IEP provided seventeen goals, with various specially designed supports including occupational therapy, speech and language instruction, a personalized behavioral support plan including a consultation with a board-certified behavioral analyst each week, and a one-on-one aide.  (*Id*.)  The IEP stated that A.J. would not participate with non-disabled peers for core academic

instruction and that he would receive supplemental special education for more than 20% but less than 80% of his school day. (*Id*.) The suggested placement was in a supplemental autistic support class for more than 20% but less than 80% of the day along with itinerant speech and language instruction at an elementary school in the District. (*Id*. at 15.)

## PROCEDURAL HISTORY

The parents filed a *pro se* petition for a due process hearing on October 14, 2018, to challenge the October IEP's proposed placement. (Doc. 1, p. 5.) The parties began the due process hearing on January 3, 2019. (*Id*.) After hearing witness testimony for two days, the hearing officer issued an interim order ordering a diagnostic evaluation of A.J. and an interim placement at a different elementary school in order to conduct the evaluation. (Doc. 17-6.) Following this evaluation, the hearing officer held additional hearings on May 21, 2019, and June 7, 2019. (Docs. 17-7, 17-8.) The hearing officer issued his final order on August 9, 2019. (Doc. 17-3.)

A.J. filed the complaint in this case on November 11, 2019, alleging a denial of a free appropriate public education ("FAPE") under the IDEA and requesting that the court reverse the hearing officer's decision, reverse the hearing officer's order implementing the May 2019 IEP, and reverse the hearing officer's decision denying parents' compensatory education request. (Doc. 1, p. 16.) The parents

also request that the court affirm the hearing officer's decision that the District provide A.J. with a one-on-one aide, re-evaluate A.J. at the end of the 2019-2020 school year, and train the aide so the aide can implement the IEP and behavior plan.  (*Id.*)  Finally, the parents ask the court award compensatory education, reimburse parents for expert fees, and award attorneys' fees.  (*Id.*)

The District filed their answer on January 6, 2020.  (Doc. 5.)  A.J. filed a motion for judgment on the administrative record on February 28, 2020.  (Doc. 14.)  The administrative record was filed on March 11, 2020.  (Doc. 17.)  The District filed their response on March 26, 2020. (Doc. 18.)  A.J. filed a reply brief on April 2, 2020.  (Doc. 19.)  Thus, having been fully briefed, the motion is ripe for review.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  Additionally, this court has jurisdiction under 20 U.S.C. § 1415(i)(3), which gives district courts jurisdiction over any civil actions brought pursuant to this section without regard to the amount in controversy.

## STANDARD OF REVIEW

The IDEA gives a party aggrieved by a decision in a due process hearing the right to bring a civil action in a district court of the United States. 20 U.S.C. § 1415(i)(2)(A). When the aggrieved party chooses to exercise that right, the IDEA further provides that the court deciding the civil action "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant the relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

A district court reviewing a dispute under IDEA's administrative process must give "due weight and deference to the findings in the administrative proceedings . . . [which has been described as] modified de novo review." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009) (citations omitted). In line with the statute, "the district court must make an independent determination based on a preponderance of the evidence." *Oberti by Oberti v. Bd. of Ed. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1219 (3d Cir. 1993). In order to achieve the modified de novo review that gives due deference to the administrative proceedings yet also employs an independent determination, the district court must "tak[e] the ALJ's factual findings as prima facie correct . . . [then] decide whether the record contradicts those factual findings." *S.H. v. State-Operated Sch. Dist. of Cty. of Newark*, 336 F.3d 260, 271

(3d. Cir. 2003). If the district court wishes to deviate from the ALJ's factual findings, it is obligated to explain why. *Id*. at 270.

Additionally, the ALJ's credibility findings deserve deference. *Carlisle Area Sch. v. Scott P. by & through Bess P.*, 62 F.3d 520, 528–29 (3d Cir. 1995). Credibility findings can only be overturned if "extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Id*.

## DISCUSSION

A.J. argues, in various ways, that the hearing officer erred in applying the legal standard to the facts and erred in finding the testimony of his expert, Dr. Woldoff, less credible than the District's expert's testimony. The District argues that the hearing officer did not err and that A.J. was provided a FAPE. The court holds that the hearing officer did not err in his findings of fact, credibility determinations, or application of the law to the facts. Therefore, the hearing officer's decision that A.J. received a FAPE in the least restrictive environment ("LRE") is upheld.

### A. Legal standard under IDEA

A.J. brings his claims under the IDEA, which requires a state receiving federal funding to "demonstrate that it 'has in effect a policy that assures all handicapped children the right to a free appropriate public education.'" *Bd. of*

*Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982) (quoting 20 U.S.C. § 1412(1)).  The congressional intent behind this statute is "to bring previously excluded handicapped children into the public education system . . . and to require the States to adopt procedures which would result in individual consideration of and instruction of each child."  *Id*. at 189.

Compliance with the IDEA requires schools to provide a FAPE to handicapped children.  *Id*. at 181.  A FAPE "consists of educational instruction specially designed to meet the unique needs to the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  *Id*. at 188.  Thus, the "basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."  *Id.* at 201.  This specially designed instruction is achieved "by means of an individualized educational program ("IEP")."  *Id*. at 181.  For a school to meet its obligation to provide a FAPE under the IDEA, the proffered IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).  The appropriate question is "whether the IEP is reasonable, not whether the court regards it as ideal."  *Id*. at 999.

In addition to requiring that a handicapped child is provided a FAPE, this education must also be in the least restrictive environment.  20 U.S.C. § 1412(a)(5)(A).  The IDEA requires that a student with disabilities must be educated with non-disabled children to the maximum extent possible.  *H.L. v. Downingtown Area Sch. Dist.*, 624 F. App'x 64, 68 (3d Cir. 2015).  Specifically, "special classes, separate schooling, or other removal of [the child] from the regular education environment should occur only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* (citations omitted).  In sum, the IDEA requires "a FAPE in the least restrictive environment that will confer a meaningful educational benefit." *Id*. at 69.

The Third Circuit has established a two-prong test to determine whether an IEP meets the LRE requirement.  The test seeks to determine "whether a child with disabilities can be educated satisfactorily in a regular class with supplemental aides and services," and, if not, "whether the school has included the child in school programs with non-disabled children to the maximum extent appropriate." *Oberti*, 995 F.2d at 1217–18.  The first prong has three sub-factors.  Thus, to determine whether a child with disabilities can satisfactorily be educated in a regular class, the court must consider:

> (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational

benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the others students in the class.

*Id.*

If the court determines that removing the student from the regular class was justified, the court must then consider the second prong, which involves considering "whether the school has included the child in school programs with non-disabled children to the maximum extent appropriate." *Id.*

### B. The Hearing Officer's Decision and Order

After holding four days of witness testimony and reviewing the administrative record, the hearing officer articulated his findings of fact, which are largely repeated above. (Doc. 17-3, pp. 2–15.) The hearing officer also correctly expected the parents to bear the burden of proof, as they were the party seeking relief. (*Id.* at 15.) *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). The court finds no reason to overturn these findings based on the record. *S.H.*, 336 F.3d at 271.

Additionally, the hearing officer gave more weight to the District's expert than the parents' expert. (Doc. 17-3, p. 16.) The hearing officer based this determination on the program coordinator's knowledge of student-specific facts and her greater contact with A.J. (*Id.* at n.6.) Finding no extrinsic evidence in the record that would justify overturning this determination, the court will uphold the

hearing officer's determination that the District's expert's opinion was entitled to greater weight. *Carlisle Sch.*, 62 F.3d at 528–29.

After correctly stating the FAPE and LRE requirements, the hearing officer concluded that A.J.'s IEPs provided him with a FAPE in the LRE. (Doc. 17-3, p. 19.) First, the hearing officer sought to determine if A.J. could be satisfactorily educated in the regular education class with supplemental aids and services by using the first *Oberti* prong. (*Id.*) Accordingly, the hearing officer analyzed each of the subfactors. Initially, the hearing officer concluded that "[e]ach IEP included sufficient supplemental aids and supports, to support [A.J.'s] education, for the remainder of the day in regular education" showing that the District made a reasonable effort to accommodate A.J. in the regular classroom (*Id.*) Next, the hearing officer stated that A.J. was less on task in the regular education classroom with aides than in the autistic support classroom, and that A.J. attempted to elope more while in the regular education classroom. (*Id.* at 19–20.) The hearing officer concluded that this behavior cuts against significant learning in the regular education classroom. (*Id.* at 20.) Lastly, the hearing officer concluded that these behaviors would negatively affect the education of the other students in the regular education setting. (*Id.*) Based on these behaviors combined with A.J.'s diagnostic evaluation scores, the hearing officer concluded that the regular education setting is not the appropriate setting for A.J. at this time. (*Id.*)

Having decided that the District was justified in removing A.J. under the first *Oberti* prong, the hearing officer then moved onto the second prong of the test. Based on the testimony provided by the autistic support program coordinator as to the strategies utilized by the District in educating A.J., the hearing officer found that the District took significant steps to educate A.J. in the regular education setting at all times. (*Id*. at 21.) As a result of this analysis, the hearing officer rejected the parents' claim that the District did not include additional aids and supports to keep A.J. in the LRE.

Finally, the hearing officer analyzed the May 2019 IEP to determine if it provided A.J. with a FAPE. The hearing officer noted that the IEP included a clear statement of A.J.'s needs and provided goals with individualized support strategies. (*Id.* at 22.) Moreover, the hearing officer noted that the proposed IEP provided time with nondisabled peers in order to facilitate A.J.'s social and communication skills. (*Id*.) Additionally, the proposed IEP calls for A.J. to receive instruction inside and outside of the regular education classroom to ensure he has access to the regular education curriculum. (*Id*.) Based on these findings, the hearing officer held that A.J's denial of FAPE claims and LRE claims were denied, and that the compensatory education claim was also denied. (*Id*. at 23.)

As a result of his findings of fact and legal analysis, the hearing officer found in favor of the District on all FAPE and LRE claims. (*Id*. at 24.)

Additionally, the hearing officer ordered the District to implement the May 2019 IEP and provide A.J. with a one-on-one aide in all classes and settings. (*Id.*) The hearing officer also ordered that the one-on-one aide should receive all necessary training. (*Id.*) Finally, the hearing officer ordered the District to reevaluate A.J.'s need for an aide at the end of the 2019–2020 school year and consider what else A.J. would need to have more time in the regular education setting. (*Id.*)

### C. The Hearing Officer Properly Considered and Rejected A.J.'s Claims

A.J. claims that the hearing officer erred in multiple ways. The court will address each alleged error in turn. First, A.J. claims the hearing officer erred in finding that he had received a FAPE when the District failed to program for his behaviors. (Doc. 14-1, p. 4.) A.J. supports this argument by claiming that the functional behavioral assessment was inadequate because it was not conducted by a board-certified behavioral analyst and because Dr. Woldoff testified about missing elements she would have liked to have seen in the assessment. (Doc. 14, p. 5.) The District argues that the proposed IEP properly addresses A.J.'s behavior, pointing to the aspects of the IEP that address A.J.'s behavioral issues and specifically refuting A.J.'s contention that the functional behavior assessment must be administered in a certain way by certain people. (Doc 18, at 20.)

The court rejects A.J.'s contention that the IEP was not programmed specifically for A.J.'s behavior. The District points to case law and statutory

language showing that a student's behavior needs to be addressed, but not prescribing a certain method for addressing those behaviors. (Doc. 18, p. 19.); 20 U.S.C. § 1414(d)(3)(B); 34 C.F.R. § 300.324(a)(2); *Pottsgrove Sch. Dist. v. D.H.,* No. 17-CV-2658, 2018 WL 4368154, at *10 (E.D. Pa. Sept. 12, 2018). The court agrees with the District and the hearing officer, finding that the IEP in question adequately addresses A.J.'s behavioral concerns with appropriate goals, strategies, and tools. Each IEP contained an assessment of A.J.'s needs, including his behavioral needs, along with multiple measurable goals with individually designed programs to help A.J. achieve those goals. (Doc. 17-3, p. 23.) Therefore, the District addressed A.J.'s behavioral needs, providing A.J. with a FAPE.

Second, A.J. claims the hearing officer erred in finding that he received a FAPE when the District only employed substitute aides who were untrained. (Doc. 14, p. 5.) A.J. claims that, although the parents rejected the IEP that would provide A.J. with one on one aides, the District violated state regulations by not providing aides anyway. (Doc. 18, p. 10.) The District contends that A.J. was not denied a FAPE and points to the fact that parents are now asking for a one on one aide after they rejected the offer of an aide in an earlier IEP. (Doc. 18, p. 22.)

The court holds that A.J. was not denied a FAPE based on his contention that his aides were untrained. While A.J. contends that Pennsylvania regulations require aides to meet "a rigorous standard of quality", this is only one qualification

16

listed in the regulation. The regulation provides, in applicable part, that "[i]nstructional paraprofessionals shall meet one of the following qualifications . . . (i) [h]ave completed at least 2 years of postsecondary study, (ii) [p]ossess an associate degree or higher, [or] (iii) [m]eet a rigorous standard of quality as demonstrated through a State or local assessment." 22 Pa. Code § 14.105. Having cited this regulation, A.J. provides no support for his contention that the aides provided were untrained other than statements made by the kindergarten teacher that the aides were "there to help staff the classroom." (Doc. 14-1, p. 6.) As these statements do not speak to the educational level of the aides and there is no evidence in the record as to the educational level of the aides, A.J. has not proved, by preponderance of the evidence, that his aides were untrained. Therefore, the hearing officer did not err when he held that A.J. received a FAPE.

Third, A.J. claims that the District's offer to place A.J. in an autism classroom will not confer a FAPE. (*Id.*) Within this point, A.J. first claims that the hearing officer failed to apply the *Oberti* analysis required by the Third Circuit to determine if the placement is in the LRE. (*Id.* at 6–9.) To support this point, A.J. consistently points to Dr. Woldoff's testimony about the best placement for A.J.. (*Id.* at 7.) Next, A.J. claims the more-restrictive placement will impede A.J.'s social development, again citing Dr. Woldoff's testimony. (*Id.*) Then, A.J. claims that he must be educated in the general education classroom of his home school per

the Third Circuit's LRE standard and per the testimony of Dr. Woldoff.  (*Id.*)  The District argues that the hearing officer correctly applied the legal standard to the record.  (Doc. 18, pp. 10–18.)

The court rejects A.J.'s contention that the hearing officer did not properly apply the *Oberti* analysis.  As laid out above, the hearing officer correctly applied the LRE standard in order to determine if A.J. could receive a meaningful educational benefit in the regular education setting.  Having determined that A.J. could not receive a meaningful educational benefit in the regular education setting and that the District was justified in removing A.J. from this setting, the hearing officer examined whether the District made all possible efforts to have A.J. in the regular education classroom.  The hearing officer found that the District met these requirements and that A.J. was unable to provide any quantum of evidence to the contrary.  After reviewing the administrative record, the court finds no evidence that would contradict the hearing officer's factual findings or application.  Therefore, the hearing officer correctly held that A.J. received a FAPE from the District.

A.J. largely bases his reasoning on the testimony of the parents' expert.  However, the hearing officer placed more weight on the District's expert's testimony, and the court finds no reason to overturn this finding.  The District's expert is the coordinator of the autism program and has observed A.J. multiple

times. She is also knowledgeable as to the techniques and curriculum employed in the autism classroom. The parents' expert observed A.J. twice and conducted various other tests. The hearing officer properly placed more weight on the District's expert and thus properly analyzed the facts in light of that determination. Therefore, the hearing officer properly analyzed A.J.'s LRE claim.

Since the court holds that the hearing officer correctly determined that A.J. was not denied a FAPE in the LRE at any time, the court will not consider A.J.'s claims for compensatory education[3]. *Carlisle*, 62 F.3d at 537 (holding that it is necessary to show that some IEP was inappropriate in order to consider a claim for compensatory education). Therefore, the court will not reverse the hearing officer's decision or order. (Doc. 17-3.)

## CONCLUSION

For the foregoing reasons, A.J.'s motion for judgment on the administrative record is denied. (Doc. 14.) An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: August 6, 2020

---

[3] "A court award of compensatory education requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation." *M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir. 1996). Compensatory education satisfies "the congressional intent to provide relief for the deprivation" of the child's right to a FAPE. *Id.*